UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| JOHN R. BLANDFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.: 3:08-CV-394 |
| | ) | (VARLAN/GUYTON) |
| EXXON MOBIL CORPORATION | ) | |
| d/b/a EXXON MOBIL FUELS | ) | |
| MARKETING COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

This civil action is before the Court on defendant's Motion for Summary Judgment [Doc. 22], in which defendant contends that this case presents no genuine issues of material fact and that summary judgment is therefore appropriate as a matter of law. Plaintiff has filed a response in opposition to this motion [Doc. 44]. Defendant has filed a reply to the response [Doc. 56]. The motion for summary judgment is now ripe for this Court's consideration.

### **I.    Background**

Plaintiff filed the original complaint in this case in the Circuit Court for Knox County, Tennessee on August 27, 2008 [Doc. 1-2]. The case was removed to this Court on September 26, 2008 [Doc. 2]. Plaintiff filed the first amended complaint on February 12, 2009 [Doc. 12]. Defendant filed its answer to the first amended complaint on March 2, 2009 [Doc. 13].

At all times relevant to the cause of action in this case, plaintiff resided at 7865 Scenic Oaks Road, Knoxville, Tennessee 37938 [Doc. 12, ¶ 6]. Plaintiff continues to work in Tennessee and in other states as an employee of defendant [*Id.*]. At the time of the filing of the first amended complaint, plaintiff was 57 years old; worked for defendant as a Distributor Territory Manager (a "TM") servicing Tennessee, Kentucky, and Ohio; and had been an employee of defendant for approximately thirty-four years [*Id.*, ¶ 8].

As a Distributor TM, plaintiff reports to an Area Manager, who in turn reports to the Distributor Business Manager [Doc. 53]. Other types of TMs employed by defendant include Company Operated Retail Store TMs ("CORS TMs") [*Id.*]. Distributor TMs work with independent businesspeople who are deciding whether to buy products from defendant [*Id.*]. CORS TMs, by contrast, are principally concerned with running retail operations that only sell defendant's products [*Id.*].

Before 2002, defendant awarded pay increases to plaintiff and to other TMs based upon sustained merit, performance, and experience [Doc. 12, ¶ 10]. Defendant tracked the career development and promotion of TMs by a progression of numerical job classifications [*Id.*]. This progression generally correlated job level classification with maturity in age [*Id.*, ¶ 11]. TMs with "level 26" classifications, for example, were generally older than TMs at "level 25" [*Id.*]. Before 2002, in accordance with this system, plaintiff received significant merit increases as a result of his performance and experience with defendant [*Id.*]. Plaintiff was a level 26 TM at that time, the highest level then achievable by a TM [*Id.*; Doc. 55].

2

In late 2001, defendant introduced a new TM pay program (the "TM Salary Program") [Doc. 12, ¶ 12]. Prior to introducing this program, defendant undertook a study which compared the job requirements of TMs employed by defendant to the job requirements of positions across several industries [*Id.*, ¶ 13]. The implementation of the TM Salary Program eliminated TM job classifications 24, 25, and 26 [*Id.*, ¶ 14]. The TM Salary Program also created a new "salary curve" which substituted increases based on performance and merit with de minimus pay increases [*Id.*]. Since the implementation of the TM Salary Program, plaintiff has received only de minimus pay raises, as opposed to the larger merit- and performance-based pay raises he received prior to 2002 [*Id.*, ¶ 16]. Plaintiff contends that, as a result of the implementation of the TM salary program, he "makes significantly less on a cost of living basis despite a significant increase in the size of [his] sales territory and [his] attendant job responsibilities" [*Id.*].

On the basis of these allegations, plaintiff brings a claim of age discrimination against defendant under the federal Age Discrimination in Employment Act of 1967, as amended, codified at 29 U.S.C. §§ 621, *et seq.* (the "ADEA") and under the Tennessee Human Rights Act, codified at Tenn. Code Ann. §§ 4-21-101, *et seq.* (the "THRA") [*Id.*, ¶¶ 17-19].[1] Plaintiff seeks a declaratory judgment that defendant's conduct violates his rights under the ADEA and the THRA; an injunction preventing defendant from engaging in this conduct;

---

[1] The Court notes that "THRA claims [of age discrimination] are analyzed in the same manner as Title VII claims" of age discrimination. *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc.*, 173 F.3d 988, 993 (6th Cir. 1999) (citing *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996)).

compensatory damages; liquidated damages; damages for "humiliation, embarrassment, and emotional distress"; prejudgment interest; and attorney's fees [Doc. 12].

On February 16, 2010, defendant filed its motion for summary judgment [Doc. 22], in which it contends that this case presents no genuine issues of material fact and that summary judgment is therefore appropriate as a matter of law. Plaintiff filed his response in opposition to this motion on April 5, 2010 [Doc. 44]. Defendant filed a reply to the response on April 15, 2010 [Doc. 56].

The Court has carefully considered the motion for summary judgment, the response, and the reply in light of the applicable law. For the reasons that follow, the motion for summary judgment will be granted and this case will be dismissed.

**II.     Standard of Review**

Summary judgment is proper only "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact exist. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n.2 (1986). The Court views the facts and all inferences to be drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002). To establish a genuine issue as to the existence of a particular element, the non-moving party must point to evidence in the record upon which a reasonable finder of fact could find in its favor. *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). The genuine issue must also be material; that is, it must involve facts that might affect the outcome of the suit under the governing law. *Id.*

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper question for the factfinder. *Id.* at 250. The judge does not weigh the evidence or determine the truth of the matter. *Id.* at 249. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

## III. Analysis

As noted, defendant argues that this case presents no genuine issues of material fact and that summary judgment is therefore appropriate as a matter of law [Doc. 22]. In support of this argument, defendant contends that plaintiff has offered neither direct nor circumstantial evidence of age discrimination sufficient to withstand summary judgment [Doc. 23]. Plaintiff argues in response that he has offered direct and circumstantial evidence sufficient to withstand summary judgment [Docs. 53, 55].

The Court notes that plaintiff brings this case under two distinct theories of age discrimination: a "disparate treatment" theory, and a "disparate impact" theory. Plaintiff offers direct and circumstantial evidence in support of his disparate treatment theory. He offers circumstantial evidence in support of his disparate impact theory. The Court considers each theory of recovery below.

5

## A. Disparate Treatment Theory: Direct Evidence

Defendant first argues that plaintiff has failed to offer direct evidence of age discrimination sufficient to withstand summary judgment under a disparate treatment theory. "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). A "plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2352 (2009); *see also Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009) (holding same).

As direct evidence that plaintiff was the victim of intentional discrimination, plaintiff points to a single statement made by Ben Buckland, the human resources representative responsible for U.S. fuels and marketing for defendant, during a conference call in October 2006 [*see* Docs. 23, 53]. Plaintiff explains that, when he communicated his belief to defendant that the TM Salary Program discriminated on the basis of age, a conference call was scheduled that included Mr. Buckland; Kendall MacGibbon, defendant's Distributor Business Manager for the United States from April 2002 through March 2009; Jim Coleman, an Area Manager with defendant corporation; and plaintiff [Docs. 23, 53]. Plaintiff explains further that, during the course of this conference call, Mr. "Buckland effectively remarked to [plaintiff] that 'the value of experience goes down with age'" [Doc. 53]. Plaintiff argues that this comment "is facially discriminatory and reflects a patently discriminatory attitude

toward the value of older workers"; "denigrates and demeans the years of expertise unique to older workers"; and "is the essence of direct evidence and reveals the motive behind [defendant's] continued implementation of the [TM Salary] Program" [*Id.*].

The Court finds this remark insufficient to constitute direct evidence of intentional age discrimination. "[W]hen examining 'statements allegedly showing employer bias' on the basis of age, courts should 'consider[] whether the comments were made by a decision maker or by an agent within the scope of his employment; whether they were related to the decision-making process; whether they were more than merely vague, ambiguous, or isolated remarks; and whether they were proximate in time to the act of termination.'" *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 395 (6th Cir. 2008) (quoting *Cooley v. Carmike Cinemas*, 25 F.3d 1325, 1330 (6th Cir. 1994)). In this case, the comment to which plaintiff refers was made by a human resources representative for defendant who was not involved in the design or implementation of the TM Salary Program in 2003. The comment was made nearly four years after the approval and implementation of the challenged salary program. *See Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993) (age-related comments made nearly a year before an adverse employment decision were too remote in time to have influenced that decision). This single comment thus seems to fall squarely within the category of "vague, ambiguous, or isolated remarks" that do not constitute direct evidence sufficient to withstand summary judgment. *See Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004) ("[S]tatements allegedly made by various members of . . . management about the general need to lower the average age of their workforce . . . [do] not

7

constitute direct evidence of age-based bias . . . ."). Plaintiff has thus failed to meet his burden of proof under a disparate treatment theory using direct evidence.

B. **Disparate Treatment Theory: Circumstantial Evidence**

Plaintiff can still maintain his action for age discrimination under a disparate treatment theory if he can point to circumstantial evidence sufficient to lead a reasonable factfinder to conclude that plaintiff was discriminated against on the basis of age. "Circumstantial evidence [of discrimination] . . . is proof that does not on its face establish discriminatory animus, but [that] does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (en banc). The Sixth Circuit uses the familiar framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to analyze ADEA claims brought under a disparate treatment theory and based upon circumstantial evidence. *Geiger*, 579 F.3d at 622. To set forth a prima facie case of age discrimination under this framework, a plaintiff "must show that he or she: (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) suffered such action under circumstances which give rise to an inference of unlawful discrimination." *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364-65 (6th Cir. 2007). If the plaintiff establishes a prima facie case, "the defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action." *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007). If the defendant can come forth with such a reason, "the plaintiff must identify evidence from which a reasonable jury could conclude that the proferred reason is actually a pretext for unlawful discrimination."

*Id.* "Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Defendant does not dispute that plaintiff was a member of the protected class, or that plaintiff is qualified for the position he holds [*see* Doc. 23]. The Court thus considers only those prongs of the *McDonnell Douglas* test which defendant argues plaintiff cannot satisfy: that plaintiff suffered an adverse employment action, and that plaintiff suffered such action under circumstances which give rise to an inference of unlawful discrimination.

### 1. Adverse Employment Action

Defendant argues that plaintiff did not suffer an adverse employment action in this case. In support of this argument, defendant points out that plaintiff "admits, since the implementation of the TM Salary [Program] in January 2003, [that] his salary has never decreased and, in fact, each year his salary has gone up" [Doc. 23]. Defendant thus argues that plaintiff "has not suffered an adverse employment action," but has instead "benefited from salary increases" [*Id.*].

Plaintiff disagrees. Plaintiff argues that the "TM Salary Program has limited or capped [his] pay increases to de minimus amounts while . . . significantly younger [CORS TMs] are eligible for merit increases" [Doc. 53]. Plaintiff explains that, "for the six years preceding the implementation of the TM Salary Program, [his] total salary increases were $26,700; an average 4.3% salary increase each year," but that in the "six years after the

9

implementation of the TM Salary Program, his salary increases totaled $5,400; an average 0.76% salary increase each year" [*Id.*]. Plaintiff thus argues that he suffered an adverse employment action because he has received smaller raises since the implementation of the TM Salary Program than he would have received had the TM Salary Program never been implemented.

The Court agrees with plaintiff, and finds as a matter of law that the reduction in the raises plaintiff allegedly suffered could constitute an adverse employment action under the third prong of the *McDonnell Douglas* test. While defendant is correct that an adverse employment action must be "materially adverse," and can include "a decrease in wage or salary" or a "material loss of benefits," *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886 (6th Cir. 1996), examples like these are not exhaustive. An "adverse employment action" is instead construed more broadly as an action that "constitutes a significant change in employment status, such as . . . a decision causing a significant change in benefits." *White v. Burlington N. & Santa Fe R. Co.*, 364 F.3d 789, 798 (6th Cir. 2004). There can be no doubt that the decision to implement the TM Salary Program caused a "significant change in benefits" for plaintiff, in terms of the annual raise he expected to receive. *See Russell v. Principi*, 257 F.3d 815, 819 (D.D.C. 2001) (rejecting "the notion that a denial of a monetary bonus is not a cognizable employment action under Title VII"); *Tarshis v. Riese Org.*, 211 F.3d 30, 38 (2d Cir. 2000), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 513 (2002)) ("[T]he third element of a prima facie case [of discrimination] is satisfied by showing that an employer's action alters the terms and conditions of employment

in a negative way."). The Court thus finds that plaintiff has satisfied this prong of the *McDonnell Douglas* test.

The Court now considers the fourth and final prong of the *McDonnell Douglas* test: whether plaintiff suffered the adverse employment action in this case under circumstances giving rise to an inference of unlawful discrimination.

> 2. **Whether Plaintiff Suffered the Adverse Employment Action Under Circumstances Giving Rise to an Inference of Unlawful Discrimination**

Defendant next argues that the circumstances in this case do not give rise to an inference of unlawful discrimination. Both parties rely on *EEOC v. Governor Mifflin Sch. Dist.*, 623 F. Supp. 734 (E.D. Pa. 1985) to make their case. The Court thus examines the parties' arguments in light of that precedent.[2]

Plaintiff in *Governor Mifflin*, the Equal Employment Opportunity Commission (the "EEOC"), challenged the salary system and pay raises negotiated between the Governor Mifflin School District (the "GMSD") and the Governor Mifflin Education Association (the "GMEA") from 1981-84. *Governor Mifflin*, 623 F. Supp. at 735. Before 1974, the GMSD had a fifteen-step salary system. *Id.* Under that system, teachers entered at step one, and progressed year-by-year to step fifteen, at which point there was no further step-by-step advancement. *Id.* A teacher moving from one step to the next received a step increase in

---

[2] The Court notes that plaintiff has provided no other case law to support his argument on this point.

salary. *Id.* A teacher at step fifteen no longer received step increases, but did receive a salary increase each year. *Id.*

This system changed in 1974. *Id.* In each year from 1974 until the 1983-84 academic year, additional steps were added to the top end of the salary ladder. *Id.* No teacher ever reached the top of the ladder, because the top step rose every year. *Id.* Under this system, each teacher received a yearly salary increase of a set dollar amount, which was identical for all teachers in the district. *Id.*

Beginning in 1981, another variation on the method for disbursing salary increases was instituted. *Id.* From 1981 until the 1983-84 academic year, all teachers received $1,000 plus five percent of their salary as a yearly increase. *Id.* As a result, the highest-paid teachers–those with the most seniority, at the high end of the salary system– received the biggest raises. *Id.* at 736. The disparity between the highest-paid teachers and the lowest-paid teachers began to grow each year. *Id.*

The GMEA proposed another new system in 1983. *Id.* Under this proposal, the number of steps was to be reduced to twenty-four; all teachers were to be given an overall raise; and each teacher would advance step-by-step until he or she reached the top step. *Id.* Plaintiff in *Governor Mifflin* argued that the salary increases for the years 1981-82 and 1982-83 discriminated against older teachers in violation of the ADEA. *Id.* Plaintiff also argued that the salary adjustments made pursuant to the system proposed in 1983 violated the ADEA because employees at higher levels under that plan received lower salary increases than younger teachers. *Id.*

After a careful review of these various pay structures, the court in *Governor Mifflin* found that plaintiff had failed to present a prima facie case of age discrimination. *Id.* at 743-44. The court reasoned that, while it was "true that the teachers at the top of the step system received the smallest [pay] increases," it was also true that these teachers "received the highest pay." *Id.* Discrimination was only evident "when the amount of the pay increase [was] separated from all other aspects of the compensation system, and the amount given to the older teachers as opposed to the teachers with less seniority [was] examined in isolation." *Id.* Believing such "dissection of the compensation system" to be "improper," the court declined to "focus too narrowly" on this aspect of the compensation system, and granted summary judgment for the defendant. *Id.* at 744-46.

The core components of the adjustments to the pay structure at issue in *Governor Mifflin* are indistinguishable from the adjustments to the pay structure at issue in this case. Here, plaintiff alleges that, before 2002, defendant "based the salary levels of Territory Managers on an oil industry comparison and awarded pay increases to [plaintiff] and other Territory Managers based on sustained merit and performance as well as experience" [Doc. 12, ¶ 10]. Plaintiff further alleges that "[a]fter the projected implementation of the TM Salary Program . . . the statistical data reveal[ed] that younger CORS TMs (with lower classification codes, [fewer] years of service and lower salaries) received significantly higher salary increases and significantly higher percentage increases in salary from 2002 to 2003 than the Distributor TMs" [Doc. 53].

13

The Court finds these facts neither discriminatory nor surprising. As defendant explains, "[w]hen the TM Salary Program was implemented, all TMs received a base raise of $1,200" [Doc. 56]. "Employees below the salary maximum were eligible for additional merit increases" [*Id.*]. "[E]mployees whose salaries exceeded the ceiling of the salary range were not eligible for these additional merit increases," not because of their age, but "because they were already the highest paid employees" [*Id.*]. Thus, viewing the compensation system in this case as an "overall package of payroll benefits"–as the court in *Governor Mifflin* viewed the compensation system at issue in that case–the Court finds no evidence of the disparate treatment of plaintiff under this system. *See Governor Mifflin*, 623 F. Supp. at 744; *see also Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1045 (7th Cir. 1988) ("The discovery that young [employees] receive larger annual raises [than older employees] *on a percentage basis* is no evidence at all of age discrimination."); *D'Aquino v. Citicorp/Diner's Club, Inc.*, 755 F. Supp. 218, 221 (N.D. Ill. 1991) ("[E]vidence that younger persons are receiving larger salary increases . . . is by no means conclusive of age discrimination."). The Court thus finds that plaintiff has failed to offer evidence sufficient to make out a prima facie case of age discrimination under the *McDonnell Douglas* framework.

### 3. Legitimate, Nondiscriminatory Reason for Adverse Employment Action, and Pretext

Having found that plaintiff has failed to offer evidence sufficient to make out a prima facie case of age discrimination under a disparate treatment theory, the Court could end its analysis here. The Court nevertheless finds that even if plaintiff could make out a prima

facie case of age discrimination, defendant has satisfied its burden under *McDonnell Douglas* by producing sufficient evidence of a nondiscriminatory reason for its action.[3] Plaintiff, moreover, has failed to offer evidence sufficient to demonstrate that defendant's proffered reasons are pretextual. A plaintiff can demonstrate pretext by showing that a proffered reason (1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse employment action. *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 728 (6th Cir. 2007). A plaintiff can satisfy this burden, for example, by showing "that the employer failed to make a reasonably informed and considered decision before taking its adverse employment action, thereby making its decisional process 'unworthy of credence.'" *Smith v. Chrysler Corp.*, 155 F.3d 799, 807-08 (6th Cir. 1998) (quoting *Burdine*, 450 U.S. at 256).

It is true, as plaintiff argues, that "statistics as to an [employer's] employment policy and practice may be helpful to a determination of whether [the employer's decision] . . . conformed to a general pattern of discrimination." *McDonnell Douglas*, 411 U.S. at 805. None of the statistical evidence to which plaintiff points, however, rebuts defendant's nondiscriminatory explanation in this case. Plaintiff cites to "oil industry comparisons in [a] December 2000 presentation indicat[ing] that [defendant's] TMs were paid 4.5[%] less than other oil companies," and to a "2003 power point presentation demonstrat[ing] that Towers

---

[3] While plaintiff "[a]ssum[es] *arguendo* . . . that [defendant's] proffered reasons for implementing the TM Salary Program may be considered nondiscriminatory," plaintiff also "disputes" the validity of these reasons [Doc. 53]. Plaintiff, however, offers no refutation of defendant's proffered reasons other than his general denial of their validity.

Perrin's Oil Industry Group Job Match Survey had higher annual salaries than Mercer's Multi-Outlet Retailer Comp Survey" [Doc. 55]. But the fact that other benchmarks may have existed, and that defendant corporation elected not to rely on them when it designed the TM Salary Program, cannot establish pretext where considerable evidence exists that the corporation had a legitimate nondiscriminatory basis for its action. *See Chrysler Corp.*, 155 F.3d at 807 ("[T]he decisional process used by the employer [need not] be optimal or . . . [leave] no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.").

That is the case here. Before implementing the challenged compensation system, defendant purchased Multi-Outlet Retailer Compensation Surveys for 2001 and 2002 from The William Mercer Company, a third-party consulting group [Doc. 26-5]. These surveys included data for retailer area manager positions from approximately fifty companies, including oil and gas companies like Chevron and British Petroleum [*Id.*]. After comparing data on its own salaries to that contained in the third-party salary surveys, and after analyzing the effects on its employees of the implementation of the proposed TM Salary Program, defendant reviewed and approved the Program at the executive level of the retail business line of fuels marketing [Docs. 26-4, 26-5]. This evaluation and implementation process, contrary to plaintiff's argument, "shows that [defendant] implemented the TM Salary [Program] for legitimate reasons, including: (1) to harmonize the TM payroll systems of Exxon and Mobil [following the merger of these two companies]; (2) to reduce overall costs of business; and (3) to remain competitive" [Doc. 23].

The Court thus finds that plaintiff's claim of age discrimination under a disparate treatment theory cannot survive application of the *McDonnell Douglas* framework. Summary judgment on this claim under a disparate treatment theory is therefore appropriate.

### C. Disparate Impact Theory

Plaintiff also brings his age discrimination claim under a disparate impact theory. The Court notes first "that 'the scope of disparate-impact liability under [the] ADEA is narrower than under Title VII." *Allen*, 545 F.3d at 403 (quoting *Smith v. City of Jackson*, 544 U.S. 228, 239 (2005)). This is in part because "age, unlike race or other classifications protected by Title VII, not uncommonly has relevance to an individual's capacity to engage in certain types of employment." *City of Jackson*, 544 U.S. at 240. To survive summary judgment under this theory, "it is not enough [for a plaintiff] to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Id.* at 241. "[P]oint[ing] out that [a] pay plan . . . is relatively less generous to older workers than to younger workers," for example, will not suffice to meet this standard. *Id.* Rather, the employee "must 'isolate and identify the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'" *Allen*, 545 F.3d at 403 (quoting *Meacham v. Knolls Atomic Power Lab.*, 128 S. Ct. 2395, 2405-06 (2008)).

In support of his disparate impact theory, plaintiff contends that "[t]he specific employment practices at issue in this case are two fold": "First, [defendant] anchored [the TM pay curve] to the retail external environment based on CORS TMs job match," "caus[ing] other TM jobs, including the Distributor TM job, to be included on the [TM

17

Salary] Program" [Doc. 55]. "Second . . . at the August 2006 evaluation workshop, [defendant] conducted a test: calculating mathematical scores for various positions and then comparing them to see if there was significant deviation from the CORS TM score purportedly to determine what positions stayed on or came off the [TM Salary] Program" [*Id.*].

The Court need not dwell on plaintiff's allegations under this theory. Even were the Court to accept the central proposition that these allegations are intended to advance–that "a facially neutral employment practice falls more harshly on one group than another"–defendant has successfully rebutted these allegations by showing "that the protocol in question has 'a manifest relationship to the employment'" in question. *Dunlap v. TVA*, 519 F.3d 626, 629 (6th Cir. 2008) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 432 (1971)). Employers can meet this standard–and thus can exempt themselves from liability–"if they can show that their employment practices are based on 'reasonable factors other than age.'" *Allen*, 545 F.3d at 404 (quoting 29 U.S.C. § 623(f)(1)).

Reasonable factors other than age are present in this case, and revolve principally around defendant's determination that "the TM job family pay structure was not aligned with the competitive market" [*see* Doc. 23]. Defendant has offered a succinct explanation, borne out by the evidence in this case, which identifies the reasonable factors upon which it based its decision to implement the TM Salary Program, and which highlights the reasonableness of the steps it took in actually designing and implementing that Program:

> [Defendant] analyzed and compared its own data to third party salary surveys; completed detailed analysis of the implementation of the TM Salary Curve on

individual employees; designed the TM Salary Curve to achieve the desired competitive objectives within the salary architecture of [defendant's] salary system; and reviewed and approved the TM Salary Curve at the executive level of the Retail business line of Fuels Marketing.

[*Id.*]. The Court thus finds that defendant's decision to implement the TM Salary Program was based on reasonable factors other than age, and that no reasonable factfinder could find otherwise.[4] Plaintiff's claim fails under a disparate impact theory. Summary judgment on plaintiff's age discrimination claim under this theory is therefore appropriate.

## IV. Conclusion

For the reasons above, defendant's Motion for Summary Judgment [Doc. 22] will be granted. The pending Motion for *Daubert* Hearing [Doc. 68] will be denied as moot and this case will be dismissed.

An order accompanying this opinion will be entered.

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE

---

[4] The Court also notes a few of the many difficulties with the two arguments plaintiff has advanced in support of his disparate impact theory. With respect to defendant's first argument–and as the Court explained *supra* Part III.B.3–the fact that defendant used a CORS TM benchmark to adjust the salaries of Distributor TMs cannot suffice to establish age discrimination. That seems to be particularly true where, as here, defendant's management was seeking to bring into balance two distinct salary systems in the wake of a large corporate merger. And with respect to plaintiff's second argument, defendant points out that the "test" to which plaintiff refers occurred four years after the implementation of the TM Salary Program, and three years after the end of the time period covered by plaintiff's expert report [*see* Doc. 56]. In granting summary judgment here, the Court thus heeds the Sixth Circuit's admonition that allowing cases to proceed on the basis of evidence like this "could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical imbalances." *Allen*, 545 F.3d at 404 (quoting *City of Jackson*, 544 U.S. at 241).